**Laura CONTOIS, Executrix of the Estate of Hugo Mortenson, Plaintiff,**

v.

**ABLE INDUSTRIES INC., et al., Defendants.**

**Civil No. 3:07CV01328(AWT).**

United States District Court, D. Connecticut.

Nov. 13, 2007.

Brian P. Kenney, Christopher Meisenkothen, Early, Ludwick & Sweeney, New Haven, CT, for Plaintiff.

Mena J. Bonazzoli, Steven I. Frenkel, Cummings & Lockwood, Stamford, CT, John J. Robinson, McCarter & English, Hartford, CT, Jonathan F. Tabasky, Cooley, Manion & Jones, LLP, Boston, MA, Richard M. Dighello, Jr., Updike, Kelly & Spellacy, P.C., Frank G. Usseglio, Kristen E. Kenney, Kenny, O'Keefe & Usseglio, Hartford, CT, James R. Oswald, Adler, Pollock & Sheehan, Providence, RI, Robert Stuart Ludlum, Pierce, Davis & Perritano, LLP, Boston, MA, Kevin C. McCaffrey, Cullen & Dykman, LLP, Brooklyn, NY, George W. Clark, Cetrulo & Capone, Boston, MA, Anthony J. Iaconis, Diserio, Martin, O'Connor & Castiglioni, Stamford, CT, William E. Murray, Edwards, Angell, Palmer & Dodge, Hartford, CT, Thomas F. Maxwell, Jr., Pullman & Comley, Bridgeport, CT, Marc S. Edrich, Peter J. Ponziani, Timothy S. Jajliardo, Litchfield Cavo, Avon, CT, Bryna Rosen Misiura, Michael D. Simons, The Governo Law Firm LLC, Boston, MA, Edward V. Walsh, Geoffrey Lane Squitiero, Maher & Murtha, Bridgeport, CT, Robert R. Dombrowski, Hartford, CT, Reed Adam Slatas, McGivney & Kluger, Farmington, CT, Dan E. Labelle, Joshua M. Auxier, Halloran & Sage, Westport, CT, for Defendants.

### RULING ON MOTION TO REMAND

ALVIN W. THOMPSON, District Judge.

By a complaint dated September 10, 2004, and amended on December 30, 2004, the plaintiff initiated an action in Connecticut Superior Court seeking damages for injuries allegedly sustained as a result of Hugo Mortenson being exposed to asbestos-containing materials. Mortenson had been diagnosed with malignant mesothelioma in August 2002 and died on December 27, 2002. On August 31, 2007, defendant Buffalo Pumps, Inc. ("Buffalo Pumps") filed a notice of removal of the case to federal court pursuant to 28 U.S.C. § 1442(a), the federal officer jurisdiction statute. The petition for removal was subsequently joined by defendant General Electric Company ("GE"). The plaintiff has moved to remand the case to state court on the grounds that (1) the notice of removal was untimely filed, and (2) the defendants have failed to satisfy the requirements for federal officer jurisdiction. For the reasons set forth below, the motion to remand is being denied.

### I. TIMELINESS

The plaintiff argues that, under 28 U.S.C. 1446(b), Buffalo Pumps' notice of removal was untimely because it was filed more than 30 days after service of the original complaint, as well as more than 30 days after service of the Amended Complaint; the Amended Complaint provides additional information not contained in the original complaint. However, § 1446(b) states:

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

28 U.S.C. § 1446(b). The Second Circuit has noted that "[a] case is removable when the initial pleading enables the defendant to 'intelligently ascertain' removability from the face of such pleading...." *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 205–06 (2d Cir.2001) (internal citation omitted). "A pleading enables a defendant to intelligently ascertain removability when it provides the necessary facts to support [the] removal petition ... While this standard requires a defendant to apply a reasonable amount of intelligence in

ascertaining removability, it does not require a defendant to look beyond the initial pleading for facts giving rise to removability." *Id.* at 206.

■ The court concludes that the defendants could not have intelligently ascertained that the case was removable even at the time they received the Amended Complaint. The Amended Complaint merely states that Mortenson was exposed to asbestos while serving in the U.S. Navy from 1951 to 1955 and while working as an electrical engineer from 1962 to 2002. (*See* Doc. No. 1, Notice of Removal, Ex. 1). It does not provide any information related to the ship(s) on which he served while in the Navy or as to the employer(s) he worked for as an electrical engineer. It also fails to indicate which products manufactured by which of the over sixty defendants named in the Amended Complaint caused Mortenson to be exposed to asbestos. Nor does it allege whether Mortenson came into contact with such products during his four-year stint in the Navy and/or during the forty-year period he worked as an electrical engineer. The court concludes that Buffalo Pumps could not have ascertained grounds for removal based on federal officer jurisdiction given the very general reference in the Amended Complaint to Mortenson's service in the Navy.

The plaintiff argues that the defendants should have at least been able to intelligently ascertain removability once they received the plaintiff's interrogatory responses. Interrogatory Number Forty Three asked the plaintiff to provide information relating to the names and addresses of Mortenson's employers and job sites, the dates of his employment, the asbestos products used by Mortenson (including the names of the manufacturers if known), other asbestos products the plaintiff contends Mortenson was exposed to (including the

names of the manufacturers if known), and the source of the exposure to other asbestos products to which the plaintiff contends Mortenson was exposed. (*See* Doc. No. 69, GE's Mem. Opp., Ex. 9, at 16–17). In response to this very specific request for details concerning Mortenson's exposure to asbestos, the plaintiff responded that Mortenson worked as a seaman in the U.S. Navy on the USS Bordelon from 1951 to 1955 and that he worked as an engineer at Carling Technologies Inc. ("Carling") in Plainville, Connecticut, from 1960 to 2002. Although this response provided more information than did the Amended Complaint, it still failed to provide Buffalo Pumps with sufficient information to intelligently ascertain the removability of the case. The plaintiff stated that Mortenson worked on the USS Bordelon, but provided no information about where on this vessel he performed his duties. In addition, the interrogatory response also made no mention of any specific asbestos-containing product with which Mortenson came in contact. Finally, the interrogatory response reiterated that Mortenson was also exposed to asbestos-containing materials during the over forty years he worked at Carling, leaving the defendants to guess as to whether Mortenson was exposed to products they manufactured that were used on the USS Bordelon during Mortenson's time in the Navy or that were used at Carling during the much longer period of time he worked there. A proper response to Interrogatory Number 43 would have given the defendants the answers they needed to make the determination that the case was removable, but the plaintiff failed to give one.

The defendants were only provided with an ascertainable basis for removing the case when they received the plaintiff's expert report of R. Bruce Woodruff, a Captain, USN (RET), on August 2, 2007. In that report, Woodruff states his opinion

that Mortenson "may have been exposed to asbestos aboard the USS Bordelon (DDR 881) on which he was stationed from 1951–1955—possibly in significant quantities." (*See* Notice of Removal, Ex. 2 at 4). In this report, specific asbestos-containing products, including main steam turbines manufactured by GE and pumps manufactured by Buffalo Pumps, were mentioned for the first time. The report focuses exclusively on the time spent by Mortenson in the Navy, with no mention of possible exposure to asbestos while he worked at Carling. After receiving this report, Buffalo Pumps filed its Notice of Removal on August 31, 2007. Thus, its filing occurred within thirty days from the date when the defendants could intelligently ascertain removability. Therefore, the court concludes that the petition for removal was timely filed.

## II. FEDERAL OFFICER JURISDICTION

### A. *Legal Standard*

■ The federal officer removal statute permits removal from state court of cases against "any officer (or any person acting under that officer) of the United States or any agency thereof, sued in an official or individual capacity for any act under color of such office...." 28 U.S.C. § 1442(a)(1). A defendant who is not a federal officer or agency must show (1) that it is a person within the meaning of the statute, (2) that it was "acting under" a federal officer and that there was a "causal connection" between the charged conduct and the asserted official authority, and (3) that it has a "colorable" federal defense. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* 488 F.3d 112, 124 (2d Cir.2007).

■ It is undisputed that corporations are "persons" within the meaning of the statute. To establish the second element, a defendant must show that "the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Id.* (citation and internal quotation marks omitted). In examining whether defendants satisfy this requirement, courts should look to the extent to which defendants "acted under federal direction at the time they were engaged in the conduct now being sued upon." *Id.* at 125. Acts that are performed under the "general auspices" of a federal officer, or the mere participation of a corporation in a regulated industry, are insufficient to support removal based on federal officer jurisdiction. *Id.*

■ To establish the third element, i.e. the existence of a colorable federal defense, a defendant must prove that (1) "the United States approved reasonably precise specifications" for the military equipment supplied by the contractor; (2) "the equipment conformed to those specifications; and (3) the [military contractor] warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States." *Boyle v. United Techs. Corp.,* 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). To establish that *Boyle* displaces any state law duty to warn, a defendant "must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law." *Grispo v. Eagle–Picher Indus., Inc.,* 897 F.2d 626, 630 (2d Cir.1990). In addition, a contractor "must show that whatever warnings accompanied a product resulted from a determination of a government official, and thus that the Government itself 'dictated' the content of the warnings meant to accompany the product." *Id.* (internal citations omitted). "For the military contractor defense to apply, govern-

ment officials ultimately must remain the agents of decision." *Id.*

## B. *Discussion*

### 1. Colorable Federal Defense

■ In order to raise a colorable federal defense in this case, the defendants must establish that the U.S. Navy approved reasonably precise specifications for equipment on board Navy ships and dictated the content of all warnings that may have appeared on such equipment. To establish this element, Buffalo Pumps and GE have supplied the court with several affidavits from former Navy officials. Roger Horne, a retired Rear Admiral, avers that pumps built for Navy vessels were "manufactured according to detailed specifications prepared ... by the Navy." (Notice of Removal, Ex. 3, Horne Aff. ¶ 5). These specifications "also covered the nature of any communication affixed to pumps or other equipment supplied to the Navy," (*id.* ¶ 4) and "governed the form and content of written materials to be delivered with equipment." (*Id.* ¶ 15). Retired Rear Admiral Ben Lehman avers that "[m]ilitary specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings." (GE's Mem. Opp., Ex. 6, Lehman Aff. ¶ 4). "Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines." (*Id.*). This evidence supports the conclusion that the Navy had precise specifications for all equipment on board its ships, as well as control over the content of any warnings or safety information.

Second, the defendants have shown that any products supplied to the Navy conformed to its detailed specifications. The affidavits submitted by the defendants support the conclusion that the Navy would not have permitted a manufacturer to place its own warning on equipment without approval from the Navy. Admiral Horne states that the "Navy believed that excessive warnings for common shipboard hazards led to apathy and resulting disregard of hazard." (Doc. No. 62, Buffalo Pumps Mem. Opp., Ex. 1, Horne Supp. Aff. ¶ 12). Therefore, "the Navy would not have permitted ... a vendor such as Buffalo Pumps to attach any type of warning or cautionary statement not required and approved by the Navy, including any statement related to asbestos." (*Id.*). An attempt by a manufacturer to affix a warning label "would have been futile, and would have been rejected as contrary to Navy protocols for instruction and training relating to the use of asbestos materials." (*Id.*). Admiral Lehman states that "the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors." (GE's Mem. Opp., Ex. 6, Lehman Aff. ¶ 5). Another retired Rear Admiral, David Sargent, avers that "the Navy would not have permitted Buffalo Pumps or other equipment suppliers to place asbestos related warnings in technical manuals supplied with pumps for Navy ships during the 1940s, 1950s, and 1960s." (Buffalo Pumps Mem. Opp., Ex. 2, Sargent Supp. Aff. ¶ 14). Finally, Lawrence Stillwell Betts, a retired Navy Captain and president of a medical corporation, concludes, after an extensive review of the relevant literature, that "[i]t would be unreasonable to assume that the Navy would have accepted gratuitous comments from equipment manufacturers about hazards associated with a product it neither made nor sold and about which the Navy was already aware." (GE's Mem. Opp., Ex. 7, Betts Aff. ¶ 20).

Third, in order to raise a colorable federal defense, the defendants must show

that the supplier warned the Navy about dangers in the use of any product that were known to the supplier but were not known to the Navy. The Betts affidavit provides sufficient evidence to satisfy this element. Betts relies not only on his own personal experience, but also on extensive historical documentation and research, which is attached to his affidavit. Betts reviews the evidence of the standards and procedures the Navy adopted with respect to asbestos. He observes that "the Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art." (*Id.* at ¶ 30). From the early 1920s to the late 1960s, "there was nothing about the hazards associated with the use of asbestos-containing products on a marine steam turbine on United States Navy ships known by a turbine manufacturer ... that [was] not known by the United States." (*Id.*). This conclusion is supplemented by the opinion of Samuel Forman, a medical doctor who investigated the Navy's historical handling and knowledge of industrial hygiene issues, including asbestos. Relying upon documentary evidence, Forman concludes that the "Navy knew by 1922 that asbestos exposure was a potential health hazard, and that its knowledge and awareness continued to develop through the following decades." (Notice of Removal, Ex. 5, Forman Aff. ¶ 9). This evidence from Betts and Forman establishes the superior knowledge of potential hazards on the part of the Navy vis-a-vis the equipment manufacturers at the time the injury to Mortenson is claimed to have occurred.

The plaintiff attacks the opinions offered in the affidavits provided by Buffalo Pumps and General Electric as conclusory. However, the opinions offered by Betts, in particular, can hardly be considered conclusory. The Betts affidavit is accompanied by voluminous documentation and historical research that provides a back-ground for his conclusions. In conjunction with the other affidavits of retired Navy admirals submitted by the defendants, the evidence offered by Betts raises a colorable federal defense. Whether that defense will be successful is an issue for trial, not one that the court should address on a motion to remand.

## 2. The Requirement that the Defendants Acted Under a Federal Officer or Agency and the Existence of a Casual Nexus Between the Plaintiff's Claims and the Defendants' Conduct

The evidence discussed above also satisfies the other requirements for federal officer jurisdiction. The evidence establishing that (i) the Navy had complete control over the manufacture and design of every piece of equipment on its ships, as well as the nature of warnings issued, and (ii) contractors, such as Buffalo Pumps and GE, would not have been permitted by the Navy to place warning labels or cautionary language on products containing asbestos aboard Navy ships, shows that the defendants were "acting under" a federal agency when they supplied products to the Navy, and also shows the requisite causal nexus between the defendants' conduct under the direction of a federal officer and the plaintiff's claim that the defendants failed to warn Mortenson of the hazards associated with asbestos.

## 3. The Plaintiff's Arguments in Favor of Remand

The plaintiff makes several arguments in support of her contention that the requirements of the federal officer removal statute are not met here, each of which the court finds unpersuasive. First, the plaintiff relies on a military specification issued on June 6, 1961 relating to service manuals for shipboard electrical and mechanical

equipment. This specification makes reference to an "intent to accept the manufacturer's commercial type of manual or one prepared in accordance with his commercial practice whenever it is roughly equivalent to the detail requirements included herein." (Doc. No. 22, Pl.'s Mem. Supp., Ex. F, MIL–M–15071D). The specification states that "[a]pproval of a class A manual will be by the Bureau of Ships only and, once approved, the basic manual shall not be modified without the approval of the Bureau of Ships." (*Id.*). Similarly, class B manuals must be approved by the Bureau or its field representative and cannot be modified without permission. Finally, the specification reads in pertinent part: "Notes, cautions, and warnings should be used to emphasize important and critical instructions. The use should be as sparing as is consistent with real need." (*Id.*). The plaintiff contends that this specification indicates that the defendants had discretion over whether to include warnings about the hazards of asbestos on their products sold to the Navy and in use aboard the USS Bordelon during the time Mortenson served in the Navy.

As an initial matter, this specification was issued *after* Mortenson had completed his service in the Navy. Moreover, the language in this specification does not support the plaintiff's position. Rather, it suggests that Navy approval was required for any safety information contained in the manufacturer's service manual because the prerequisite for acceptance of the manufacturer's manual is that it be roughly equivalent to the detail requirements included in that military specification. The specification also explicitly states that the use of warnings should be sparing. The affidavits of Betts, Horne, and Sargent state that this specification did not suggest that manufacturers were free to provide their own warning information with respect to products on board Navy ships, but

rather reflects the Navy's emphasis on the uniformity and standardization of safety information that was provided. The court finds that evidence persuasive.

Second, the plaintiff points to the Uniform Labeling Program–Navy, which is a uniform labeling program for hazardous industrial chemicals and materials, dated September 24, 1956. This document states that the instructions regarding labeling requirements for hazardous chemical products during the usage stage are "not intended to govern" the "type of labels to be affixed by the manufacturer." (Pl.'s Mem. Supp., Ex. G, Uniform Labeling Program). However, the Uniform Labeling Program—Navy would not have applied to product manufacturers, such as Buffalo Pumps and GE, that contracted with the Navy because, by its terms, it "governed the labeling of hazardous chemicals by Navy personnel, not outside product manufacturers." *Machnik v. Buffalo Pumps, Inc.*, 506 F.Supp.2d 99, 104, n. 3 (D.Conn. 2007). *But see Fortier v. AMPCO–Pittsburgh Corp.*, 2007 WL 735703 at *2 (D.Conn. March 7, 2007) (concluding that under this program suppliers were free to include warnings not dictated by the Navy). This interpretation of the Uniform Labeling Program—Navy is supported by the well-researched Betts affidavit submitted in this case.

Third, the plaintiff points to the deposition testimony of Martin Kraft, a current Buffalo Pumps employee, in which Kraft concedes that Buffalo Pumps put a warning label relating to asbestos on its pumps in 1987, even though the Navy specification in effect at the time did not require such a warning. (*See* Pl.'s Mem. Supp., Ex. A, Kraft Deposition, at 4). However, as the defendants properly note, the mere fact that Buffalo Pumps was able to put a warning related to asbestos on its products in 1987 does not necessarily mean

that it would have been able to do so decades earlier. Over the years, knowledge about the hazards of asbestos had increased dramatically. This fact is reflected by Admiral Sargent's express limitation · of his conclusion regarding Navy control over asbestos-related warnings to the 1940s, 1950s, and 1960s. For the fact that Buffalo Pumps put a warning about asbestos on its pumps for the Navy in 1987 to be given weight in the court's analysis, the plaintiff must show much more than the mere fact that the situation occurred.

The plaintiff contends that evidence she has produced regarding the experience of the Phelps Dodge Corporation, a manufacturer of asbestos-insulated wires and cables for the Navy during the 1940s and 1950s, helps support a conclusion that the defendants have not satisfied the requirements for federal officer jurisdiction. The plaintiff has provided four items of evidence. One is the deposition testimony of William Daniels, a retired Phelps Dodge employee. During his deposition, Daniels was presented with three documents from the Phelps Dodge archives, but he knew nothing about any of these documents. While Daniels' testimony may have provided the plaintiff with leads for discovering pertinent testimony, Daniels' testimony itself adds nothing to the analysis of the issue presented by the instant motion; the only meaningful evidence is the documents themselves.

As an initial matter, the court notes that in no case did the plaintiff provide an entire document, but only what the plaintiff represents are relevant excerpts. However, even those relevant excerpts fall short of showing what the plaintiff contends is shown by these documents. The first document is a copy of the first two pages of a "Cable Comparison Guide" first published in 1946 to facilitate utilization of electric shipboard cable and to assist in the planning of cable installations. The plaintiff points to the second paragraph of the preface, but the first paragraph of the preface is more pertinent to the issue under consideration. That paragraph reads as follows:

> The information in this reference guide is based on current and superseded issues of Section S62–2 of the General Specifications for Machinery for Vessels of the United States Navy and is not intended to replace that specification. All applications, installations, rating and characteristics of the cable are to be in accordance with the specification. In the event of any conflict between the information in this guide and the detailed requirements of Section S62–2 of the General Specification for Ships of the U.S. Navy, the latter shall govern.

(Pl.'s Mem. Supp., Ex. B, "Cable Comparison Guide"). Thus, the language in this document is more consistent with the defendants' contentions than with those of the plaintiff.

The second document is an April 25, 1950 Phelps Dodge internal memorandum also concerning shipboard cable for the Navy. However, it is not apparent from this memorandum that this is an instance of the Navy supplying samples directly to Phelps Dodge for evaluating, testing, and recommendations. Rather, the only thing that can be said is that the Navy has given Phelps Dodge data, which has been reviewed by Phelps Dodge. In the first paragraph discussing the power cable, the memorandum makes reference to the manufacturer producing a "cable which will pass the specification," not to the manufacturer advising the Navy what the specification should be. (*Id.,* Ex. B, "Inter–Office Correspondence"). This document does not do what the plaintiff contends it does, i.e. illustrate that the Navy consulted with

industry and sought industry's advice and recommendations on materials and testing.

However, the third document does appear to document a meeting that was part of a process of the Navy consulting with industry and seeking its advice and recommendations on materials and testing. The third document is a March 21, 1949 report of a meeting attended by representatives of the Navy and individuals from various companies. The purpose of the meeting was to review the combined experiences of the military and industry in the use of underwater cable. But it is clear from the portion of the report that has been provided by the plaintiff that, unlike the Navy's standards and procedures with respect to asbestos that were already in place, this was a new product for use by the Navy. The report also appears to indicate that the Navy would be writing the specification for the cable and had simply gotten input from people in private industry who were familiar with the area before proceeding to write the specification. Thus, this document is consistent with the defendants' contention that once the Navy had developed specifications in a particular area, compliance with those specifications was required.

Finally, the plaintiff relies on the recent Second Circuit holding in *MTBE*. In *MTBE*, several states brought actions in state court against corporations that manufactured or sold gasoline containing methyl tertiary butyl ether ("MTBE"). The corporations attempted to remove the actions to federal court, arguing that the federal officer removal statute was applicable merely because the defendants were participants in a heavily regulated industry. The Second Circuit held that removal was inappropriate because the Clean Air

Act and its implementing regulations did not require the use of MTBE, and therefore, the corporations had failed to establish that they were acting under a federal officer or agency. *MTBE*, 488 F.3d at 124–132. The court concludes that *MTBE* is inapposite. Here, the defendants have not produced evidence which establishes merely that they were participants in a heavily regulated industry, but rather have produced evidence that establishes that they were operating under the direct control of federal officers.[1]

The court finds the evidence produced by the defendants more persuasive than the fact that Buffalo Pumps put a warning label relating to asbestos on its pumps in 1987 and the fact that Navy officials held a meeting with representatives of Phelps Dodge and other companies in 1949 to review the combined experiences of the military and industry in the use of a new product, i.e. underwater cable.

### 4. The "Defective Design" Claim

The defendants contend that, in addition to a failure to warn claim, the plaintiffs set forth a defective design claim in the Amended Complaint. The plaintiff alleges, *inter alia*, that the "asbestos-containing products were unreasonably defective" because "said products were and are unreasonably dangerous, in that they were and are dangerous to an extent beyond that which the ordinary worker in the position of the plaintiff would contemplate." (GE's Mem. Opp., Ex. 8, Amended Complaint, ¶ 6(a)(2)). As discussed above, the defendants have submitted affidavits from Horne, who avers that "the Navy retained the 'final say' over the design of any piece of equipment," (Horne Aff. ¶ 9), and Lehman, who avers that "the Navy

---

1. The plaintiff also argues that the court should be wary of permitting removal of the case because of inefficiencies present in the

asbestos litigation before the Multi-district Litigation Panel. This argument is irrelevant to the merits of the instant motion.

had complete control over every aspect of each piece of equipment." (Lehman Aff. ¶ 4). Therefore, the defendants have a military contractor defense to the defective design claim. The court agrees with the defendants that this case is properly removable to federal court as long as they have a military contractor defense to any of the plaintiff's claims. The plaintiff had no response to this argument either in her submissions to the court or during oral argument, and the court finds that the defendants have also satisfied the requirements for federal officer removal based on the defective design claim.

## III. CONCLUSION

For the reasons set forth above, the Plaintiffs' Motion to Remand (Doc. No. 21) is hereby DENIED.

It is so ordered.