**William A. O'CONNELL**

v.

**FOSTER WHEELER ENERGY CORPORATION, A.W. Chesterton Company, and Buffalo Pumps, Inc.**

**Civil Action No. 08–10078–RGS.**

United States District Court, D. Massachusetts.

April 7, 2008.

Victoria M. Almeida, Mark O. Denehy, Adler Pollock and Sheehan PC, Providence, RI, Marianne E. Brown, David M. Governo, Bryna Rosen Misiura, Michael D. Simons, Governo Law Firm LLC, Tracy A.R. Jolly, John B. Manning, Jonathan F. Tabasky, Cooley Manion Jones LLP, Boston, MA, for Defendant.

Edward P. Coady, David W. Fanikos, Coady & Associates, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR REMAND

STEARNS, District Judge.

Plaintiff William A. O'Connell was diagnosed with malignant mesothelioma in July of 2007. O'Connell alleges an exposure to asbestos while working at the Fore River Shipyard (Fore River) in Quincy, Massachusetts, from approximately 1960 to 1961. O'Connell claims that defendants, including Buffalo Pumps, Inc., (Buffalo Pumps),[1] were negligent and breached a duty under state law by failing to warn him of the health hazards associated with asbestos.

O'Connell filed this action in Middlesex Superior Court on November 9, 2007. On January 18, 2008, Buffalo Pumps filed a notice of removal pursuant to 28 U.S.C. § 1442(a)(1), the Federal Officer Removal Statute (FORS).[2] On February 6, 2008, O'Connell filed a motion to remand.[3] Buffalo Pumps filed its opposition on March 11, 2008.[4]

### DISCUSSION

Under FORS, an action filed in state court may be removed, despite the non-federal cast of the complaint, if: (1) the defendant can demonstrate it was acting under the direction of a federal officer or agency; (2) the defendant has a colorable defense under federal law; and (3) a causal connection exists between the defendant's acts or omissions and the claims asserted by the plaintiff.[5] *See Mesa v. California*, 489 U.S. 121, 132–134, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989); *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187, 196 (D.Mass.2008); *Nesbiet v. Gen. Elec. Co.*, 399 F.Supp.2d 205, 210 (S.D.N.Y.2005). The defendant bears the

---

1. Buffalo Pumps manufactured and supplied pumps for United States Navy ships.

2. Specifically, section 1442(a)(1) provides: "A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue." 28 U.S.C. § 1442(a)(1).

3. O'Connell also requests costs and fees incurred as a result of the removal pursuant to 28 U.S.C. § 1447(c).

4. No other defendant filed a brief in opposition to the motion to remand.

5. Although removal statutes are typically construed narrowly, the purpose of FORS is to ensure a federal forum for defenses of official immunity. *See Willingham v. Morgan*, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). Accordingly, the policy favoring removal "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Id.*

burden on all three elements. *See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers,* 132 F.3d 824, 831 (1st Cir.1997). At issue here is whether Buffalo Pumps can assert a colorable federal defense to O'Connell's failure to warn claim.[6]

### Colorable Federal Defense

 Buffalo Pumps asserts that it is immune from state tort liability on grounds that it was acting as a military contractor at the time of O'Connell's alleged asbestos exposure. *See Boyle v. United Techs., Corp.,* 487 U.S. 500, 506, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (analyzing a design defect defense under FORS). The purpose of the defense is to shield government contractors from state tort liability for defects in military equipment where there is a "significant conflict" between state law and the "uniquely federal interest" in immunizing the trade-off between greater safety and greater combat effectiveness. *Id.* at 511–512, 108 S.Ct. 2510. To demonstrate a colorable military contractor defense in a failure to warn context,[7] the contractor must produce sufficient evidence suggesting a genuine conflict between its federal obligations and a state law imposing liability for the failure to warn. State law will be displaced if the contractor can show that: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; and (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 1003–1004 (7th Cir.1996) (applying the military contractor defense announced in *Boyle, supra,* to failure-to-warn claims). For removal purposes, the defendant's showing need only be plausible; not necessarily conclusive of the issue. *See Jefferson County,* 527 U.S. at 431, 119 S.Ct. 2069.

Buffalo Pumps argues that the communication of safety and health information

---

6. O'Connell has expressly waived any claim based on defective design and "any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government." Complaint, at ¶ 4. In O'Connell's view, this disclaimer eliminates federal subject matter jurisdiction, including any that would attach under FORS. This is not the law. The removal statute creates an exception to the well-pleaded complaint rule. *See Jefferson County v. Acker,* 527 U.S. 423, 430–431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999); *Mesa v. California,* 489 U.S. 121, 136, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). "[R]egardless of whether the plaintiff's cause of action rests on state law . . . once [defendant] meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction." *Machnik v. Buffalo Pumps Inc.,* 506 F.Supp.2d 99, 103 n. 1 (D.Conn.2007). *See also Ballenger v. Agco Corp.,* No. 06–2271–CW, 2007 WL 1813821,

at *2 (N.D.Cal. June 22, 2007) (denying motion to remand despite the disclaimer of "[e]very claim arising under the Constitution, treaties, or laws of the United States . . . includ[ing] any claim arising from an act on a Federal Enclave as defined by Article I, section 8, clause 17 of the United States Constitution . . . any claim arising from any act or omission of the United States, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States.").

7. Although the First Circuit has yet to address the federal contractor defense in the failure to warn context, the court will follow persuasive opinions in other circuits which have held that the defense should apply. *See Emory v. McDonnell Douglas Corp.,* 148 F.3d 347, 350 (4th Cir.1998) (citing to cases from the Second, Fifth, Sixth, Seventh, and Ninth Circuits).

about asbestos to Fore River workers was a matter exclusively within the Navy's control. Buffalo Pumps offers the affidavits of the following four persons in support of its position: (1) Roger Horne (Horne Affidavit), a retired Rear Admiral of the United States Navy; (2) Dr. Samuel Forman (Forman Affidavit), the proprietor of an occupational health clinic monitoring asbestos exposure and a student of the Navy's historical awareness of asbestos hazards; (3) David Sargent Jr. (Sargent Affidavit), also a Navy Rear Admiral; and (4) Martin Kraft (Kraft Affidavit), the current production manager for Buffalo Pumps. The affidavits and attached exhibits clearly establish a plausible federal contractor defense. The analysis required by the first and second elements of the *Boyle* defense are closely tied. Under the first prong, the defendant must establish that the United States approved "reasonably precise specifications" for the equipment supplied by the contractor, including the appropriate wording of any warnings regarding a potential hazard. *See Hilbert,* 529 F.Supp.2d at 198. Although the contractor need not show that the government prohibited it from supplementing the warnings with warnings of its own, it must produce evidence that it was acting within the parameters of reasonably precise specifications imposed by the United States. *Cf. Oliver,* 96 F.3d at 1004 (there must be an element of constraint; while a *dictat* is not required, government oversight must extend beyond the mere "rubber stamping" of a contractor's unilteral conduct). A defendant will meet its burden under the

second element of the test if it can demonstrate that "any deviation from [the government's] specifications would likely have resulted in rejection of the equipment." *Nesbiet,* 399 F.Supp.2d at 212. *See also Hilbert,* 529 F.Supp.2d at 198 n. 11.

Buffalo Pumps satisfies the first two elements by virtue of the Horne and Sargent Affidavits. Admiral Horne attests to his work as a naval ship engineer and his personal knowledge of naval ship specifications, including centrifugal pumps and related equipment, during the time of O'Connell's employment at Fore River. The Sargent Affidavit is relevant to establishing the historical pervasiveness of Navy control over all aspects of shipbuilding contracts.[8] Considered together, the affidavits reasonably establish that the specifications for the pump component supplied to the Navy by Buffalo Pumps were detailed, precise, and under the Navy's pervasive control. They also demonstrate that the Navy insisted on a meticulous review and approval process for written materials accompanying components supplied to its ships. As Admiral Sargent explains:

> [t]he Navy also had precise specifications as to the nature of the written materials to be delivered with equipment supplied to the Navy, which included engineering reference materials to assist the naval operators and maintenance personnel in servicing and maintaining such equipment and to assist the Navy training establishment to develop instructional materials and courses. These written materials are and were generically known as "instruction books"

---

8. Although Sargent's duty post-dates O'Connell's employment, he is competent to testify because in his service he was responsible for all "matters relating to both the technical and programmatic details of design, construction, delivery and support of both new and in-service aircraft carriers, expeditionary warfare and auxiliary ships of the Navy." Such "in-service" ships included those that were

built as far back as the 1950's. The exhibits to Sargent's affidavit include revisions to a 1959 technical manual for a submarine pump, which contains specific cautionary (non-asbestos) language demonstrating the depth of the Navy's control over the details of the written materials contractors were required to distribute.

or "technical manuals." Through specifications, the Navy required that certain equipment be supplied with a defined number of copies of one or more instruction books or technical manuals.

Navy personnel participated intimately in the preparation and review of these instruction books and technical manuals in a standardized format used by the Navy. These manuals included safety information to the extent—and only to the extent—directed by the Navy. Manufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy. The Navy dictated, reviewed and approved the contents of all technical manuals, including any cautionary language or emphasis. The Navy ... often created lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, including the wording of instructional material and warnings.

Sargent Affidavit, at ¶¶ 47–48.[9] Admiral Horne gives a similar explanation of the Navy's control over the content of any cautionary materials supplied by its contractors, as well as the reasons for that control:

[i]n addition to specifications regarding design and manufacturing of the equipment itself, the Navy also had detailed specifications that governed the form and content of written materials to be delivered with equipment, including

pumps, supplied to the Navy. These written materials typically consisted of technical or instruction manuals that were designed to assist the Navy engineering staff in servicing and maintaining the equipment. Navy personnel participated in and approved the preparation of this kind of information. The Navy specifications for these manuals contained detailed direction as to the kinds of information to be included. . . . The Navy relied on its training and procedures regarding general shipboard safety hazards, such as asbestos. The Navy believed that excessive warnings for common shipboard hazards led to apathy and resulting disregard of hazard. Thus, the Navy would not have permitted (either under the specifications or, as a matter of Navy practice) a vendor such as Buffalo Pumps to attach any type of warning or cautionary statement not required and approved by the Navy, including any statements related to asbestos.

Horne Affidavit, at ¶¶ 11, 16. Admiral Sargent further emphasizes that the communication of safety and health information in written materials relating to pumps or other components had to be consistent with the Navy's overall practices and priorities, and the realities of its workplaces:

[t]he reasons for the Navy's detailed control over and review and approval of all written communication regarding equipment it procured was to ensure consistency of that information with the overall goals and priorities of the Navy in its operations. The Navy employed millions of uniformed and civilian personnel aboard thousands of vessels and at hundreds of land-based facilities around the world. The information pro-

9. Admiral Sargent attaches to his affidavit a 1959 example of the detailed editing undertaken by the Navy of a draft manual submitted by a contractor for review and approval.

Attached to the Kraft Affidavit is an additional example, in this case to a draft equipment manual Buffalo Pumps submitted to the Navy in 1966.

vided with regard to equipment had to be consistent with the Navy's overall evaluation of the appropriate types and level of information its personnel required to efficiently perform their job responsibilities under a variety of circumstances. In addition, written communications regarding work practices, including safety precautions and equipment, had to be coordinated with the training of Navy personnel, the physical circumstances in which they performed their work, and the tools, protective devices and equipment and other materials available aboard Navy vessels and at Navy installations.

Sargent Affidavit, at ¶ 49.

The third element of the test requires the contractor to have warned the govern-

ment about hazards of which it had knowledge, but were unknown to the government. *See Nesbiet,* 399 F.Supp.2d at 212. The Horne Affidavit satisfies this element. According to Horne, the Navy's knowledge of the dangers of asbestos on board its ships was far more advanced than anything that would have been known to a contractor like Buffalo Pumps.[10] Therefore, the third element is met and Buffalo Pumps has a colorable defense.[11]

O'Connell argues that the affidavits submitted by Buffalo Pumps closely track those that were rejected by the district court in *Hilbert,*[12] and urges this court to follow suit. *Hilbert,* however, is not persuasive in the disposition of this case because of two essential differences in the

---

**10.** According to the Horne Affidavit:

[t]he Navy had state of the art knowledge regarding the potential risks associated with exposure to asbestos and asbestos-containing products. Acting with this knowledge about asbestos-related hazards, the Navy affirmatively addressed the issue of asbestos-related safety precautions. The Navy established its MilSpecs to accounts for the safety precautions it deemed appropriate. In dealing with asbestos, the Navy conducted its own training, adopted its own precautionary measures and procedures and provided its own warnings where such warnings were deemed appropriate.

Horne Affidavit, at ¶ 12.

**11.** Horne's testimony is further corroborated by Forman's affidavit, who, pursuant to Navy orders, reviewed the Navy's historical knowledge and practices in industrial hygiene in relation to asbestos. Forman cites to several Navy studies verifying that as early as 1922, the Navy recognized and attempted to mitigate the harm of exposure by seamen to asbestos. Foreman Affidavit, ¶ 14. Forman cites to a study appearing in a 1947 issue of the Navy's Safety Review, which noted the potential health hazards resulting from asbestos exposure. Foreman Affidavit, ¶ 32. Further, Forman cites to a 1958 safety handbook for pipefitters which warned of the dangers of asbestos and the need to wear dust respirators. Foreman Affidavit, ¶ 37.

**12.** O'Connell cites *Hilbert* for the proposition that in order to avail itself of the federal contractor defense a defendant must provide either: (1) non-testimonial evidence that the military affirmatively prohibited warnings (e.g., contracts or regulations); or (2) evidence that the contractor tried to give an asbestos warning, but was stopped by the Navy. The court disagrees with that characterization of the opinion. While citations to regulations or contractual provisions barring warnings would certainly be sufficient to state a colorable claim, the weight of the cases suggest that there is no "strict requirement that the government 'prohibit' warnings altogether or 'dictate' the contents of the warnings actually incorporated." *Oliver,* 96 F.3d at 1004 n. 8. *See also Quiles v. Sikorsky Aircraft,* 84 F.Supp.2d 154, 171 n. 5 (D.Mass.1999). Indeed, what concerned the *Hilbert* court was the complete lack of testimony from individuals with personal knowledge of the matters at hand. *See Hilbert,* 529 F.Supp.2d at 202–203 ("[The defendants'] argument thus boils down to a bald, unsupported assertion that if they had attempted to warn about the hazards of asbestos, the government would have exercised its discretion to bar the warning. At least on this record, that sort of speculation is not remotely adequate. It does not come close to demonstrating—even colorably—that the government exercised its discretion to issue

showings by defendant. First, although the plaintiff in *Hilbert* claimed exposure to asbestos while serving in the Navy, the *Hilbert* defendants failed to produce an affiant with personal knowledge of the Navy's shipbuilding program. *See Hilbert,* 529 F.Supp.2d at 200 (finding that the "most important" affiant was deficient because his knowledge was limited to Air Force practices, while the plaintiff was exposed while serving in the Navy). Here, Buffalo Pumps has submitted the affidavits of Admirals Horne and Sargent; both of whom have personal knowledge of the detailed specifications imposed on contractors by the Navy during the period of O'Connell's alleged exposure. Accordingly, the affiants do not resort to the level of "speculation" that the *Hilbert* court found objectionable.[13] Second, the *Hilbert* defendants failed to provide any evidence that the Navy regulated the content, and not just the form, of the relevant written materials. *See id.* at 201. Buffalo Pumps, however, has submitted examples of detailed, word-by-word, revisions provided by the Navy upon review of written manuals and instructions. Accordingly, the court does not find the *Hilbert* decision to be applicable.

*Acting Under and Causal Connection*

■ As a practical matter, this remaining element is closely bound to the determination that Buffalo Pumps has a colorable military contractor defense. Since

the Navy issued reasonably precise specifications as to the warnings, the court concludes, for purposes of this motion, that: (1) the Navy exercised a substantial degree of control over Buffalo Pumps's provision of warnings; and (2) the Navy's control over these warnings impeded Buffalo Pumps's ability to independently fulfill its state law obligation to warn of the dangers of asbestos (if indeed it knew of these dangers). *See Nesbiet,* 399 F.Supp.2d at 212; *Contois v. Able Indus., Inc.,* 523 F.Supp.2d 155, 161 (D.Conn.2007). Buffalo Pumps has therefore satisfied all three elements of the statute and the case was properly removed.[14]

### ORDER

For the foregoing reasons, plaintiff's motion to remand this action to state court is *DENIED.* The parties' motions for a hearing are also *DENIED.*

SO ORDERED.

---

'reasonably precise specification' as to health and safety warnings.").

13. To the extent that O'Connell takes issue with statements in the affidavits regarding general Navy practices, the court notes that his Complaint is not limited to any one ship or employer. O'Connell's allegations are directed towards exposure "during the course of his employment at the Fore River Shipyard" while working on the *USS Long Beach* and "other ships."

14. The court is aware that removal of this case will require transfer to the asbestos multidistrict litigation in the Eastern District of Pennsylvania over plaintiff's objection.