Charles CORLEY, et al., Plaintiffs

v.

LONG–LEWIS, INC., et al., Defendants.

Case No. 2:09–cv–01812–HGD.

United States District Court, N.D. Alabama, Southern Division.

Jan. 28, 2010.

G. Patterson Keahey, Jr., Tracey C. Dotson, Law Offices of G. Patterson Keahey PC, James Arthur Butts, John D. Saxon, John D. Saxon PC, Birmingham, AL, for Plaintiffs.

Jeffrey E. Friedman, Friedman Leak, Lee Taylor Patterson, Friedman Leak Dazzio Zulanas & Bowling PC, Frank E. Lankford, Jr., Huie Fernambucq & Stewart LLP, Brian M. Blythe, Bradley Arant Boult Cummings LLP, James A. Harris, III, Nicole Mapp Hardee, Harris & Harris LLP, James Alexander Wyatt, III, Parsons Lee & Juliano PC, W. Larkin Radney, IV, Lightfoot Franklin & White LLC, Allan R. Wheeler, C. Paul Cavender, Burr & Forman LLP, Jenelle R. Evans, Julian Houston Smith, III, S. Allen Baker, Jr., Balch & Bingham LLP, Michael A. Vercher, Christian & Small LLP, William T. Mills, II, Porterfield Harper Mills & Motlow PA, Edwin B. Nichols, Maynard Cooper & Gale PC, Anthony C. Harlow, Starnes & Atchison LLP, Birmingham, AL, F. Grey Redditt, Jr., Timothy Allen Clarke, Vickers Riis Murray & Curran LLC, Edward B. McDonough, Jr., Anne Laurie McClurkin, Walter T. Gilmer, Jr., Frederick G. Helmsing, Jr., McDowell, Knight, Roedder & Sledge, LLC, Mobile, AL, James G. House, III, Forman Perry Watkins Krutz & Tardy LLP, Jackson, MS, for Defendants.

## *ORDER*

HARWELL G. DAVIS, III, United States Magistrate Judge.

Plaintiffs, Charles Corley and Myra Corley, have filed a Motion to Remand.

(Doc. # 21). On July 7, 2009, plaintiffs filed a First Amended Complaint naming, *inter alia*, CBS Corporation, a Delaware corporation, f/k/a Viacom, Inc., Successor by Merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation; Garlock Sealing Technologies, LLC; and Owens–Illinois, Inc., as defendants. These defendants removed this action to federal court within 30 days of service of process. (Doc. # 1). The First Amended Complaint seeks recovery of damages arising from the allegation that plaintiff Charles Corley suffered asbestos-related injuries arising from exposure to asbestos-containing products and/or materials.

### The Amended Complaint

In the First Amended Complaint, Charles Corley asserts that he was continually exposed to asbestos-containing products that were "produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by the defendants in this case during his employment as a boiler room technician, ship-wide maintenance worker, HVAC repairman, and shade tree auto mechanic, *inter alia*, including but not limited to the following locations:...." He then lists his employer from 1946 to 1973 as the U.S. Navy, employed as a boiler room technician and ship-wide maintenance worker aboard the USS Cavalier, USS George Clymer, USS Seminole, USAT Monterrey, USS Franklin Delano Roosevelt, USS Intrepid, USS Valley Forge, USNS Mississinewa, USS Albany USS YR–65, USNS Caloosa Hatchee, and the USS West Milton. He further lists himself as self-employed from 1973 to the 1990s as a shade-tree auto mechanic and operator of a small HVAC repair business at various locations within Jefferson County, Alabama.

The Amended Complaint asserts that during the course of his employment, plaintiff worked in and around asbestos-containing turbines, motors, generators, gaskets, pumps, valves, electrical equipment, brakes, furnaces, cements, air compressors, boilers, joint compounds, grinders, rope packing, HVAC equipment and HVAC-related materials, automotive friction products, and other industrial equipment and other industrial equipment. It is alleged that Corley discovered that he had asbestos-related malignant mesothelioma on February 27, 2009.

According to the Amended Complaint, "[e]ach and every one of the following defendants produced, distributed, manufactured, installed, insured, owned, and/or maintained or controlled the premises, facilities and worksites (sic) containing asbestos-containing products and/or materials, including their own asbestos-containing products and/or materials and those produced or manufactured by others...." (Amended Complaint at ¶ 5). The Amended Complaint then lists every named defendant, including CBS Corporation, a Delaware corporation, f/k/a Viacom, Inc., Successor by Merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation; Garlock Sealing Technologies, LLC; and Owens–Illinois, Inc.

In addition to identifying these defendants, the Corleys allege, *inter alia*, that defendant CBS Corporation produced asbestos-containing products, including, but not limited to, air compressors, pumps, and valves. (*Id.* at ¶ 5(6)). They allege that Garlock Sealing Technologies, LLC (Garlock) produced asbestos-containing products, including gaskets, packing asbestos cloth, ring packing, rope packing, sheet packing, sheet gaskets and valve packing. (*Id.* at ¶ 5(42)). Plaintiffs also allege that defendant Owens–Illinois, Inc., produced asbestos-containing products, including insulation, pipe insulation, kaylo pipe insula-

tion, kaylo block, cement and adhesives. (*Id.* at ¶ 5(44)).

In the body of the Amended Complaint, perhaps anticipating the removal of this action, plaintiffs assert, *inter alia,* that this action is improper for removal because (a) the federal court lacks subject-matter jurisdiction, (b) the action does not involve a federal question, (c) there is a lack of complete diversity of citizenship between the parties,[1] and (d) plaintiffs expressly disclaim every claim arising under the Constitution, treaties or laws of the United States, including any claim arising from an act or omission on a federal enclave, or by any officer of the United States or any agency or person acting under him/her under color of such office. (*Id.* at ¶¶ 6–7).

In Count One, plaintiffs assert that defendants are strictly liable for Mr. Corley's mesothelioma because their "asbestos-containing products to which Charles Corley was exposed were in a defective condition and were unreasonably dangerous to the user, consumer or bystander; the asbestos machinery, products, or equipment were in a defective condition and unreasonably dangerous" to the plaintiff, who was an intended and foreseeable user or bystander during the use of the asbestos, in that it was, among other things, known to have an unreasonably high potential for causing respiratory diseases and cancer and lacked sufficient warnings of this potential. (*Id.* at ¶ 10).

Plaintiffs also allege that the asbestos-containing products were defective due to, among other things, a lack of warning of the dangerous properties of these products and due to their defective design resulting from the use of asbestos where it was not required and other equally suitable alternative substances were available. (*Id.* at ¶ 11(b), (g), & (h)). They further allege

that the asbestos machinery and other asbestos-containing products produced by the defendants were unreasonably dangerous to the intended users and bystanders. (*Id.* at ¶ 11). Plaintiffs also allege that the defendants and/or their predecessor entities were engaged in, or materially participated in, selling asbestos and materials containing asbestos, representing to Charles Corley and the public that the asbestos was not dangerous. (*Id.* at ¶ 12).

In Count Two, plaintiffs allege negligence in that "[e]ach of the Defendants had, but breached, duties to the plaintiffs to exercise the highest standard of care in designing, testing, manufacturing, marketing, selling asbestos and equipment or machinery which is an extraordinarily and inherently substance," including failing to use less-dangerous alternative materials, to warn of its inherent dangerousness to health, to instruct in methods to reduce the dangers of inhalation and ingestion of asbestos, to remove asbestos products from the stream of commerce, and to inspect the asbestos products for adequate warnings and instructions. (*Id.* at ¶ 16).

Plaintiffs also claim that the "contractors and subcontractors are sued for negligently installing, removing, selecting, selling sanding, cutting, and otherwise disturbing asbestos-containing products in such a manner to cause the release of asbestos fibers." Premises owners are alleged to have been negligent in "installing, removing, maintaining, or disturbing asbestos and failing to warn contractor employees of the hazards in their facilities, including their exposure to asbestos." (*Id.* at ¶ 17).

It is alleged that defendants acted intentionally and/or with gross negligence, and/or recklessly, maliciously and wanton-

---

1. Defendant Long–Lewis is an Alabama corporation, and plaintiffs are Alabama residents.

ly in that each of the defendants knew or should have known, through data available exclusively to them, that asbestos was inherently and extraordinarily dangerous if used in the manner intended and foreseen by defendants. (*Id.* at ¶ 19).

Count Three alleges breaches of warranties by the defendants "who were manufacturers, sellers, or distributors of asbestos-containing products," for failing to exercise their skills and judgment to select and furnish goods of a suitable and reasonably safe nature, to furnish products fit for the particular purposes intended, and to supply products in a merchantable condition. (*Id.* at ¶ 22).

In Count Four, titled "Conspiracy—As to Metropolitan Life Insurance Company Only," plaintiffs allege that Metropolitan Life Insurance Company (Metropolitan) agreed and conspired with defendants and others to suppress and misrepresent the hazards of exposure to asbestos. Plaintiffs allege that Metropolitan, the defendants and others engaged in actions and research as to the hazards of asbestos and "often edited out material deemed to be potentially harmful to the asbestos industry and only published favorable portions of their findings and/or refrained from publishing anything." According to plaintiffs, Metropolitan financially aided the asbestos industry in its endeavor to mislead and obfuscate.

Plaintiffs further allege that defendants knowingly and willfully conspired among themselves to perpetuate the actions and omissions referred to in the Amended Complaint in order to keep Charles Corley and others ignorant of the risks they faced when exposed to asbestos and asbestos-containing products, with the knowledge that those at risk would not discover the danger presented by asbestos. (*Id.* at ¶¶ 26–28).

Plaintiffs further assert that defendants misrepresented that "asbestos was not hazardous and/or could be used safely when they (a) had no adequate basis for such representations; and (b) knew that a significant health hazard to human life existed from asbestos." In addition, even after the dangers of asbestos became known to plaintiffs and others, defendants conspired to "mislead and misrepresent the extent of past wrongful actions and omissions." (*Id.* at ¶¶ 29–31). It is alleged that defendants "destroyed records, hid witnesses and other evidence, and committed such other wrongful and unnecessary actions so as to: (a) prevent and delay the plaintiffs and others similarly situated from filing legal action to recover these false injuries; and/or (b) defeat and/or delay such legal actions and the final collection of any judgment." (*Id.* at ¶ 31).

According to plaintiffs, defendants "aided and abetted the manufacturers, miners, suppliers, and users of asbestos and asbestos products in keeping the true dangers of asbestos exposure secret and/or misrepresented." As a direct result of these actions, plaintiffs allege that Charles Corley was exposed to asbestos and inhaled or ingested this material, resulting in mesothelioma. Plaintiffs demand judgment under this count "against the defendants jointly, severally, and collectively." (*Id.* at ¶¶ 32–35).

In Count Five, plaintiff, Myra Corley, alleges that she has suffered a loss of consortium. She seeks damages for this, as well. (*Id.* at ¶¶ 36–38).

In their claim for damages, plaintiffs assert that "Charles Corley's asbestos-related malignant mesothelioma was due to his exposure to asbestos containing products, and each and every exposure to asbestos and asbestos-containing materials contributed to the cause of his asbestos-related mesothelioma." Plaintiffs demand judgment against defendants, jointly and severally. (*Id.* at 40).

### The Motion to Remand

Defendants Garlock and Owens–Illinois removed this case based on "federal enclave" jurisdiction. (Doc. # 1, Notice of Removal). *See* U.S. Const. art. I., § 8, cl. 17.[2] CBS Corporation also sought removal of this action to federal court based on "federal officer" removal under 28 U.S.C. § 1442(a)(1). (Doc. # 2, CBS Corporation's Additional Grounds for Removal). Plaintiffs filed a timely Motion to Remand this case to state court on September 23, 2009. (Doc. # 21). In their motion, the Corleys assert that the Amended Complaint specifically disclaims any cause of action based on federal law or other theory that would invoke federal jurisdiction. They state that Mr. Corley's causes of action relate solely to defendants' failure to warn Corley of the dangers posed by their asbestos. (*Id.* at ¶ 1).

Plaintiffs note that Garlock and Owens–Illinois filed a notice of removal by relying on U.S. Constitution, Article I, Section 8, Clause 17, alleging that "a Naval Shipyard would be a 'federal enclave' within which the United States has exclusive jurisdiction." Plaintiffs state that defendants have asserted that Mr. Corley's deposition gives rise to the claim of federal enclave jurisdiction based on Mr. Corley's alleged exposure to asbestos at several shipyards that occurred during limited periods when he served in the United States Navy. They allege that Mr. Corley's deposition testimony does not support this allegation. (*Id.* at ¶¶ 2–3).

According to plaintiffs, in several of the shipyards, Mr. Corley was never exposed to asbestos and, in fact, specifically stated that he was not exposed to asbestos at the Boston Naval Shipyard, *citing* Charles Corley Depo. at 271. Plaintiffs claim that "[n]owhere in his deposition does Mr. Corley clearly and unambiguously state [that he] was exposed to asbestosis at any of the shipyards." (*Id.* at ¶ 4).

Plaintiffs also assert that "federal jurisdiction is only proper when resolution of the complaint will necessarily raise substantial questions of federal law," citing *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir.2004). (*Id.* at ¶ 6). They further state that defendants have not demonstrated that there is any claim that would support the federal contractor defense as set out in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).[3] (*Id.* at ¶ 7).

2. In this clause, the U.S. Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." The federal courts have held that such places are "federal enclaves" wherein jurisdiction is exclusively in the United States. *Lord v. Local Union No.2088, Int'l Bhd. of Elec. Workers, AFL–CIO*, 646 F.2d 1057, 1059 (5th Cir.1981).

3. *In Boyle v. United Techs. Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court recognized a broad formulation of the government contractor defense that shields manufacturers of products made for the government from tort liability for flaws in product design. The Court recognized that in certain areas of "uniquely federal interests," state law must be preempted, and if necessary replaced, by federal common law. In this case, the Supreme Court noted that one such area of uniquely federal interest is the government's procurement of military hardware. The Court grounded the contours of the defense in the "discretionary function" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), that protects the United States from liability for its agents' performance of duties involving discretionary decisions. 108 S.Ct. at 2514–18. Without the defense, the government's own tort immunity for its discretionary functions would be undermined. Contractors held liable for design features that were the subject of discretionary approval by the government would predictably pass on the costs of liability, ultimately

Plaintiffs also claim that defendants' notice of removal was untimely because, while Garlock and Owens–Illinois filed a notice of removal within 30 days after Garlock was served with the Amended Complaint, it was 65 days after Garlock had been given advance notice of the suit and 48 days after notice to Owens–Illinois regarding their impending involvement. As will be addressed below, this particular argument is without merit.

## DISCUSSION

### Federal Enclave Jurisdiction

■ The Constitution grants Congress the power "[t]o exercise exclusive Legislation in all cases whatsoever ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const. art. I., § 8, cl. 17. The jurisdiction exercised by the United States over federal enclaves is exclusive unless the deed of cession provides to the contrary or unless the cession is not accepted in the manner required by law. *Lord v. Local Union No.2088, Int'l Bhd. of Elec. Workers, AFL–CIO*, 646 F.2d 1057, 1059 (5th Cir.1981).[4]

In addition, 16 U.S.C. § 457 provides:

**Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws**

In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

The United States District Courts have jurisdiction over actions both under a statute giving jurisdiction in cases arising under the Constitution, laws and treaties of United States (Article I, Section 8, Clause 17) and under a statute providing that actions for death or injuries within a national park or other place subject to the exclusive jurisdiction of the United States shall exist as though the place were under the jurisdiction of the state within whose boundaries it is located. 16 U.S.C. § 457; *Stokes v. Adair*, 265 F.2d 662 (4th Cir. 1959). The latter is known as "federal enclave" jurisdiction.

imposing costs on the government that its immunity was intended to preclude. *See id.* at 2518.

The defense derives from the principle that where a contractor acts under the authority and direction of the United States, it shares the sovereign immunity that is enjoyed by the government. *See Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). In the military context, this immunity serves the further important purpose of shielding sensitive military decisions from scrutiny by the judiciary, the branch of government least competent to review them. Application of ordinary tort law to military design and procurement decisions is not appropriate, for the government "is required by the exigencies of our defense effort to push technology towards its limits and thereby incur risks beyond those that would be acceptable for ordinary consumer goods." *Tozer v. LTV Corp.*, 792 F.2d 403, 406 (4th Cir.1986) (quoting *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 449–50 (9th Cir.1983)).

4. Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

Defendants note that plaintiffs claim that "each and every exposure to asbestos and asbestos-containing materials contributed to" his mesothelioma. They also cite Charles Corley's deposition testimony as proof that his indivisible injury was a result of exposure to asbestos-containing products which he worked with or around at the Philadelphia Naval Shipyard, Long Beach Naval Shipyard, and Norfolk Shipyard.

In reference to working on an overhaul of the USAT Monterrey at the Philadelphia Shipyard, Charles Corley discussed his possible exposure to the asbestos-containing product, Kaylo. (Charles Corley, Aug. 25, 26, 27 and 31, 2009, Depo. at 177–79; Charles Corley, Sept. 1, 2009, Depo. at 97–102). Corley worked on the Monterrey at the government-owned Philadelphia Shipyard for about 30 days in 1953. (Charles Corley, Aug. 25, 26, 27 and 31, 2009, Depo. at 177–79). This overhaul included installing the asbestos-containing product Kaylo. With regard to this exposure, the following exchanges occurred:

Q. (Defense Counsel): ... To continue on on (sic) the Monterrey, I think, did you all—do you recall on the Monterrey that you testified that you all went into overhaul in a Philadelphia shipyard?

A. (Corley): Yes.

* * *

Q. On the Kaylo product at the Philadelphia shipyard, did you ever personally work with that?

A. Not in the yard, no.

Q. On the ship, then, did you ever work with it on the Monterrey?

A. The way I came into contact with it on the Monterrey is when they were putting it on in the shipyard, I watched them and inspected it, because it was a shipyard known for lousy work.

* * *

**So the only way I would have been exposed to Kaylo on the Monterrey would have been in that shipyard,** because I,—we did not, to my knowledge, change any of it after we left. We may have used it on some other lines, but it wasn't me.

Q. And when you saw the Kaylo product used in Philadelphia shipyard, how often was it used? Was it used every day, every week, or how often?

A. Well, laggers are usually the last one, the insulation. We call them laggers and it would only be in probably the last two weeks of the two month overhaul.

* * *

Q. Did you ever see them have to cut or saw it or modify it in any way in order to put it on?

A. Well, that's part of it. You have to do that, because there's very few straight steam lines on a ship.

Q. And when you saw them do this type of modification on the Kaylo product, did you see any kind of dust created?

A. Yes, there had to be dust from their saw.

Q. How close were you to that dust?

A. Well, sometimes I was right there with it, but most of the time I come up and looked at it after they finished it. But it had to be cleaned up, because they didn't clean up.

Q. How would you clean it up?

A. Just fox tails and dust pans.

Q. When you cleaned it up, would you see dust created?

A. Oh, yeah, there was dust everywhere, not just from that. There was all kinds of dust and debris.

Q. When you were cleaning up and this dust was created where this Kaylo product was used, did you breathe that dust?

A. **It was in the air, I had to breathe it.**

(*Id.* at 97–102) (emphasis added). He further testified that, to the best of his knowledge, the Kaylo pipe covering contained asbestos. (Charles Corley, Sept. 1, 2009, Depo. at 102–03). Mr. Corley also testified that, after leaving the Philadelphia Naval Shipyard, it was necessary to stop in Norfolk to repair faulty asbestos-containing gaskets, some of which were manufactured by Garlock. (*Id.* at 80–81).

Mr. Corley testified also that he was assigned to the USNS Mississinewa when it docked at the government-owned Norfolk Naval Shipyard for approximately three months in early 1960. During that time, he supervised removing and replacing tubes on the ship's boilers. (*Id.* at 262). He also oversaw the removal and overhaul of all the pumps on board this ship. During part of the time this work was being performed, the ship was in dry dock, but most work was performed while the ship was tied to a pier. (*Id.* at 263–64). According to Mr. Corley, there were asbestos-insulated pipes all over the ship. There was "asbestos everywhere," including the fire pumps, heat exchangers, boiler evaporators and water evaporators. (*Id.* at 257–58). The only manufacturer of any of these products that Mr. Corley can recall is General Electric which manufactured the heat exchangers on "the main one in the engine room." (*Id.* at 258).

Mr. Corley also testified that he spent time at the government-owned Long Beach Naval Shipyard. (Charles Corley Aug. 25, 26, 27 and 31, 2009, Depo. at 101). He testified that he recalls seeing Kaylo for the first time while at the Long Beach Naval Shipyard in 1949 or 1950. At that time, he was instructed in how to use it. He stated that he used it to repair damaged pipe. (Charles Corley Sept. 1, 2009, Depo. at 48–51). Corley specifically states that he handled Kaylo while working at the Long Beach shipyard. (Charles Corley Aug. 25, 26, 27 and 31, 2009, Depo. at 120–21). Consequently, there is evidence in the record that Mr. Corley was exposed to asbestos while working on ships located at these shipyards for the specific purpose of overhauling a part or all of the ships.

■ Despite plaintiffs' claims to the contrary, there is ample evidence that these facilities are federal enclaves. Defendants acknowledged that they are government-owned facilities. In addition, a fact may be judicially noticed if it is not subject to reasonable dispute, either because it is generally known within the district court's territorial jurisdiction or because it can be accurately and readily determined using sources whose accuracy cannot reasonably be questioned. Fed. R.Evid. 201(b). "[T]he taking of judicial notice of facts is … a highly limited process" because it bypasses the usual procedural safeguards involved in proving facts through competent evidence. *Shahar v. Bowers,* 120 F.3d 211, 214 (11th Cir.1997). Courts may take judicial notice of such scientific, historical, and geographical facts as the boundaries of a state or the time of sunset. *Id.* The Eleventh Circuit has held that a district court may take judicial notice of matters of public record. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999); *see also Universal Express, Inc. v. S.E.C.,* 177 Fed.Appx. 52, 53–54 (11th Cir.2006) (*per curiam*) (holding that a district court could take judicial notice of filing in a separate case without turning motion to dismiss into motion for summary judgment). The fact that the United States Supreme Court recognized the Norfolk Naval Shipyard as a federal enclave in *Western Union Tel. Co. v. Chiles,* 214

U.S. 274, 29 S.Ct. 613, 53 L.Ed. 994 (1909), is thus considered as bolstering this testimony. Finally, in *United States v. Rowe*, 599 F.2d 1319 (4th Cir.1979), the Fourth Circuit Court of Appeals recognized the Norfolk Naval Station, which encompasses the shipyard, as a federal enclave.[5]

The court also takes judicial notice of the Pennsylvania statute which cedes control of the land that encompasses the Philadelphia Naval Yard (League Island) to the exclusive use of the United States. *See* 74 Pa. Stat. 120.46. *See also Kiker v. City of Philadelphia*, 346 Pa. 624, 31 A.2d 289, 292–93 (1943) (noting that it is clear that Pennsylvania granted to the United States government exclusive jurisdiction to the Philadelphia Naval Yard).

There are also business records from the custodian of records for the Port of Long Beach which appear to establish that the Long Beach Naval Yard, before it was closed, was under the exclusive jurisdiction of the United States. However, the evidence of this is not as clear as it is with the other locations. Nevertheless, defendants have clearly established that the Philadelphia and Norfolk Naval Shipyards are federal enclaves and have submitted sufficient evidence that the Long Beach Naval Yard was one as well.

█ Plaintiffs also assert that their motion to remand is appropriate because Mr. Corley's exposure to asbestos occurred on ships which were only temporarily docked at the Philadelphia and Norfolk (and Long Beach) Naval Shipyards. They aver that nowhere is there any evidence that the exposure actually occurred on any of the shipyards' lands. This is the position taken by two U.S. District Courts in Virginia.

In *Anderson v. Crown Cork & Seal*, 93 F.Supp.2d 697 (E.D.Va.2000), the District Court for the Eastern District of Virginia reasoned as follows:

> Finally, the defendants argue that because some of the exposure occurred while the vessel was docked in the Shipyard, federal jurisdiction is appropriate. In their supplemental memorandum, the defendants concede that the Fourth Circuit has not specifically addressed the issue of whether remand is required if a portion of the plaintiff's injury occurred outside the federal enclave, as is the case here. However, as identified by the defendants, the Eastern District of Texas has twice addressed similar issues and both times denied a motion for remand. *See Reed v. Fina Oil & Chem. Co.*, 995 F.Supp. 705 (E.D.Tex.1998); *Akin v. Big Three Industries, Inc.*, 851 F.Supp. 819 (E.D.Tex.1994).

In *Reed*, the most recent of the two Texas cases, the plaintiff estate sued for damages associated with leukemia allegedly developed as a result of working in a synthetics plant. During some part of the decedent's employment, the plant was owned and operated by the United States. The United States sold the plant in 1955 to the private industry, and the decedent continued to work at the plant until 1979. In 1995, the plaintiffs filed a complaint in state court, and in 1997, the defendants removed the case pursuant to federal enclave jurisdiction. As in this case, the plaintiffs filed a motion to remand. The Eastern District of Texas court denied the plaintiffs' motion for remand finding that federal officer jurisdiction existed because the decedent "acted under a federal officer

---

**5.** Plaintiffs object to the late production of some of the items presented to establish that these locations are federal enclaves. However, to the extent that any of the material is subject to judicial notice, the court can con-

sider it even if it was not presented by defendants at all. Therefore, the fact that it is presented in an untimely manner has no effect on the court's ability to consider such material.

at least from 1944–55, and [had] satisfied each of the requirements necessary to assert federal officer removal jurisdiction." *Id.* at 712–13. Although it did not need to, the court additionally addressed the asserted federal enclave jurisdiction as an alternative basis for denying the motion to remand. *Id.* at 713. As to federal enclave jurisdiction, the court found that because the plaintiffs asserted a single, indivisible injury resulting from exposure to leukemia inducing agents between 1944 and 1979, and the injury could not be divided between the times of federal and private control of the facility, the entire claim was subject to federal enclave jurisdiction. *Id.* at 713.

In a prior case, *Akin v. Big Three Ind., Inc.*, the District Court similarly denied the motion to remand finding that "in a toxic exposure case … when the plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their employment duties, enclave jurisdiction is properly invoked." *Akin,* 851 F.Supp. at 822. The defendants argue that the plaintiff in this case, like the plaintiffs in *Reed* and in *Akin,* alleges one indivisible injury as a result of his exposure to asbestos on the U.S.S. Laffey, which was at some times located in the Norfolk Naval Shipyard, a federal enclave. The defendants contend that simply because a portion of the exposure may have occurred while the vessel was located outside of the Shipyard, this Court is not deprived of jurisdiction.

First, the decisions from the Eastern District of Texas are not binding on this Court. Second, to the extent the decisions are persuasive, the Court believes that the facts in both *Akin* and *Reed* are distinguishable from the facts in this case. Most importantly, the federal facilities in *Akin* and in *Reed,* an Air Force base and a synthetics plant, are not comparable to a vessel that moves from port to port. The plaintiffs or decedents in *Reed* and *Akin* actually worked in federal enclaves at some point. Based on the evidence before this Court, the same cannot be said for the decedent in this case. His employment was at all times on board the vessel, the U.S.S. Laffey, which, as set forth above, is not in and of itself a federal enclave. Conversely, an Air Force base is a federal enclave, and the synthetics plant in *Reed* was at some point a federal enclave. *See Akin,* 851 F.Supp. at 825; *see also Akin v. Ashland Chem. Co.,* 156 F.3d 1030, 1035, n. 5 (10th Cir.1998) (noting responses to interrogatories that all exposure occurred on base), *cert. denied,* 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999). However, the vessel in this case never was a federal enclave, but simply moved in and out of federal enclaves. This distinction is essential to the Court's consideration of the issues. The court in *Akin* specifically noted that "[h]ad some of the exposure occurred off-base, the defendants' burden of establishing enclave jurisdiction would have been heavier." *Akin,* 851 F.Supp. at 825. The court further expounded in a footnote, "[w]hen exposures allegedly occur partially inside and partially outside the boundaries of an enclave an argument would surface that the state's interest increases proportionally, while the federal interest decreases." *Id.* at n. 4. For these reasons, the Court is not persuaded by the decision in *Akin,* as the facts are dissimilar.

While the facts in *Reed* are more similar to the facts in this case, the facts are nevertheless distinguishable based on the different nature of Reed's and Thomas' (the decedents in each case) employment. In *Reed,* the decedent was a plant worker who developed leukemia allegedly based on his work in the

synthetics plant, which was admittedly a federal enclave, during some portion of the plaintiffs exposure. In this case, the federal enclave at issue is the Shipyard. The plaintiff was employed by the U.S. Navy as a seaman. There is no evidence that any of his work was associated with the Shipyard or off the U.S.S. Laffey. *See* Adams Affidavit. Thomas' association with the Shipyard was coincidental to his employment with the Navy. Such was not the case with the plaintiff in *Reed.* Additionally, as set forth above, at most the court's decision in *Reed* as to federal enclave jurisdiction was in the alternative, and therefore, it is merely *dicta* contained in decision outside of this District.

In this case, it is undisputed that the deceased was a Navy seaman, not a shipyard worker. It is additionally undisputed that the plaintiff was stationed on a vessel, the U.S.S. Laffey, which was sometimes docked at the Norfolk Naval Shipyard. However, the plaintiff claims, and the defendant has not shown otherwise, that during the majority of the plaintiff's assignment to the U.S.S. Laffey, the Laffey was at sea and not in the Norfolk Naval Shipyard. *See* Adams Affidavit. For these reasons, to the extent the cases from the Eastern District of Texas are persuasive to this Court's consideration of the issues in this case, the Court FINDS the facts in those cases clearly distinguishable from the facts before this Court.

93 F.Supp.2d. at 701–03.

In another, earlier, case relied on by the court in *Anderson,* another District Court for the Eastern District of Virginia addressed this issue, stating:

To begin, federal enclave jurisdiction grows out of Article I, section 8, clause 17 of the United States Constitution which provides:

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places Purchased by the Consent of the Legislature of the State in which the Same shall be, for other Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful buildings.

Accordingly, suits regarding property purchased in the manner stated above are to occur in the federal courts of the United States.

However, Plaintiffs argue that this "federal enclave" provision of the Constitution applies only to lands owned by the United States. Thus, contrary to the contentions of Defendant, a navy vessel, standing alone, cannot be considered a "federal enclave."

Indeed, in the vast majority of situations, a federal enclave is created only when the federal government acquires exclusive jurisdiction over land with the consent of the state or commonwealth containing the land. *See United States v. Johnson,* 994 F.2d 980, 984–85 (2d Cir.1993). The amount of authority suggesting that this ground for federal jurisdiction should extend beyond torts that occur on federally procured lands is imperceptible. Even when considering federal jurisdiction surrounding military properties, the overwhelming weight of authority focuses on land. *See id.* at 984 (Brooklyn Naval Yard is a federal enclave); *DeKalb County v. Henry C. Beck Co.,* 382 F.2d 992, 994–95 (5th Cir.1967) (federal enclave jurisdiction extends to land owned by the Veterans Administration); *Stokes v. Adair,* 265 F.2d 662 (4th Cir.1959) (Fort Leavenworth Military Reservation is a federal enclave support-

ing jurisdiction); *St. Louis–San Francisco Ry. Co. v. Satterfield,* 27 F.2d 586, 588–89 (8th Cir.1928).

Arguing to the contrary, Defendant has relied upon a case where individuals exposed to asbestos while working on naval vessels were subject to federal jurisdiction under this provision. *Fung v. Abex Corp.,* 816 F.Supp. 569, 571 (N.D.Cal.1992). However, that court's basis for jurisdiction is difficult to discern. It is unclear whether the *Fung* court was emphasizing the submarine's identity with federal lands, or going against the weight of authority and declaring the vessels themselves "federal enclaves." Accordingly, this Court rejects any suggestion that the USS NIMITZ is or ever was a "federal enclave" sufficient to establish jurisdiction in this case.

In the alternative, Defendant claims that although the USS NIMITZ was built, and Plaintiff began his duty, at the Newport News Shipyard, the decedent's service aboard the vessel took him elsewhere. The vessel was commissioned in May of 1975 and deployed soon thereafter. Accordingly, Defendant argues, some of decedent's exposure to asbestos would have logically occurred while the vessel was docked at the Norfolk Naval Station and several other Naval stations around the world. All of which, they argue, are "federal enclaves."

Plaintiffs counter arguing that the motion for judgment alleges the entirety of decedent's exposure to asbestos products occurred while aboard the USS NIMITZ, not in any part while on land at various military installations around the world. It is clear that the NIMITZ was docked at the Norfolk Naval Base for at least part of the decedent's tour. It is also clear that this facility was considered a "federal enclave" during the relevant period. *See Rivers v. Woodfield,* 1990 WL 303324 (E.D.Va.

1990). However, all the evidence before the Court, and Defendant has proffered none to the contrary, suggests that decedent's exposure has no connection to governmental lands. Accordingly, federal jurisdiction based upon the "federal enclave" provision of the Constitution is, at best, doubtful and cannot support Defendant's removal. *See Mulcahey,* 29 F.3d at 151.

*McCormick v. C.E. Thurston & Sons, Inc.,* 977 F.Supp. 400, 402–03 (E.D.Va.1997).

However, not every case holds that a U.S. Navy vessel is not a federal enclave or that working on a ship while docked at a federal enclave is not the same as actually performing work within the enclave itself. One holding to the contrary is found in *Fung v. Abex Corp.,* 816 F.Supp. 569, 571 (N.D.Cal.1992). The court in *Fung* found that both federal enclave and federal officer jurisdiction existed in a case where the plaintiff alleged that he had been exposed to asbestos. In response to a motion to remand, the defendant, General Dynamics, argued that many of plaintiffs' allegations stemmed from their employment by the United States Navy at Mare Island Shipyard, a United States Naval facility, as well as other Naval facilities. With regard to the federal enclave jurisdiction, the court held as follows:

> Defendant also argues that the claims of asbestos exposure involve plaintiffs' duties while on board United States Navy submarines constructed by General Dynamics pursuant to federal contract.

> Although plaintiffs do not mention in their complaint that the alleged exposure to asbestos took place while on federally procured submarines which were docked at Mare Island and other federal enclaves, they claim that the injuries were a consequence of their working on naval vessels under the supervi-

sion of General Dynamics. Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status. Like the facts in *Mater* [*v. Holley,* 200 F.2d 123 (5th Cir. 1952) ], plaintiffs' actions arise under the laws of the United States as stated in § 1331 and are properly the subject of federal jurisdiction.

*Id.*

Unfortunately, the decision is unclear as to whether the federal enclave jurisdiction is based on the fact that the submarine was a Navy vessel or because it was docked at facilities that were federal enclaves. However, both situations are present in the case at bar, just as they were in *Fung.*

In addition, Mr. Corley testified that he worked in and on these ships while they were tied to the dock at federal facilities and while they were in dry dock within the facilities. He further testified that, on occasion, it was necessary to turn off all the systems on the ship in order to perform needed work, making it necessary to obtain water and electricity "from the beach." Thus, Mr. Corley was not simply a seaman on a ship that simply passed through these ports on his way to another location. He was there to specifically use the facilities for performing work on the ship. He was clearly exposed to asbestos while working at these locations.

In a similar case, *Akin v. Big Three Indus., Inc.,* 851 F.Supp. 819 (E.D.Tex. 1994), the plaintiffs performed maintenance on jet engines at Tinker Air Force Base in Texas. In performing this maintenance, the plaintiffs were exposed to toxic chemicals which formed the basis of the lawsuit. The court held that in a toxic exposure case such as this, when the plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their em-

ployment duties, enclave jurisdiction is properly invoked. *Id.* at 821–22.

It is difficult to discern the difference between working on a jet engine attached to a jet that has flown in for that purpose from maintenance on a ship, especially when performed in dry dock. *See also In re Welding Rod Products,* 2005 WL 147081 (N.D.Ohio Jan. 13, 2005) wherein the court stated:

> It is notable, moreover, that a not-insignificant portion of Buteaux's exposure to welding rod fumes occurred on a federal enclave-the guided missile destroyer on which Buteaux was stationed was dry-docked at the United States Navy's Charleston Naval Shipyard. Accordingly, this Court also has federal enclave jurisdiction over Buteaux's case.

(*Id.* at *7).

In this case, plaintiff performed a substantial amount of work where he was exposed to asbestos while performing his duties on board a United States Navy vessel both at sea and at U.S. Naval bases that are federal enclaves. Within these bases, he was exposed to asbestos while working on the ship both while in the water and in dry dock. The work in dry dock also occasionally required the use of base utilities such as electricity and water. Though the above-noted cases highlight the differing opinions on when federal enclave jurisdiction exists, the undersigned believes the federal enclave jurisdiction is applicable under the facts of this case.

Plaintiffs also argue that federal law is not a substantial part of this case and that no substantial conflict exists between state and federal law. This concept is only applicable to the federal officer defense which is discussed *infra.*

Plaintiffs emphasize that Mr. Corley was subject to much more exposure to asbestos outside these locations than inside. How-

ever, plaintiffs have provided no authority for the proposition that establishes a requirement that the federal enclave have a substantial relationship, or nexus, to the plaintiff's injury. The fact that the injury occurred there is sufficient when removal is pursuant to 16 U.S.C. § 457. *See e.g., Holliday v. Extex,* 2005 WL 2158488, *4 (D.Hawai'i July 6, 2005) (the fact that a helicopter crash occurred within the bounds of Volcano National Park was sufficient to give federal court jurisdiction over negligence claim against pilot and engine manufacturer).

Plaintiffs also state that their Amended Complaint specifically disavows any federal claims. However, plaintiffs cannot avoid federal jurisdiction by attempting to "artfully plead" the defendants out of federal jurisdiction when they allege, as they do here, that Mr. Corley's exposure was ongoing over a period of years. Mr. Corley cannot avoid the federal enclave jurisdiction simply by stating that, while he is suing Garlock and Owens–Illinois for exposing him to asbestos, he is leaving out those times he was exposed while working in a federal enclave. Plaintiff has alleged that his mesothelioma is the result of ongoing exposure to asbestos. He cannot simply omit those times the ongoing exposure occurred in a federal enclave to avoid federal jurisdiction. *See Harper v. San Diego Transit Corp.,* 764 F.2d 663 (9th Cir.1985). Several other courts which have considered this issue have found precisely such a disclaimer ineffective. *See, e.g., Holdren v. Buffalo Pumps, Inc.,* 614 F.Supp.2d 129, 150–51 (D.Mass.2009); *O'Connell v. Foster Wheeler Energy Corp.,* 544 F.Supp.2d 51, 54 n. 6 (D.Mass.2008); *Machnik v. Buffalo Pumps, Inc.,* 506 F.Supp.2d 99, 103 n. 1 (D.Conn.2007). Plaintiffs could avoid federal enclave jurisdiction only by dismissal of all claims against Owens–Illinois and Garlock. Since this has not occurred, these defendants are entitled to assert federal jurisdiction pursuant to the federal enclave statute.

■ Plaintiffs also allege that removal is untimely because they gave "advance notice" via email to defendants' counsel that they intended to file an Amended Complaint adding Owens–Illinois and Garlock to the suit. If this were a basis for starting the clock for purposes of removal, a plaintiff could simply notify a defendant of its intentions and then wait 31 days before filing the complaint, thereby avoiding the possibility of removal. A plain reading of the removal statute applicable in this case does not allow for tricks of this nature. Pursuant to 28 U.S.C. § 1446(b), a defendant's notice of removal "shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based" "If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, or order or other paper from which it may first be ascertained that the case which is or has become removable. . . ." *Id.*

In rejecting a reading by the Eleventh Circuit of 28 U.S.C. § 1446(b) in a manner similar to that advocated here by plaintiffs, the U.S. Supreme Court has held:

> The Eleventh Circuit relied on the "plain meaning" of § 1446(b) that the panel perceived. *See* 125 F.3d, at 1398. In the Eleventh Circuit's view, because the term " '[r]eceipt' is the nominal form of 'receive,' which means broadly 'to come into possession of or to acquire,' " the phrase " '[receipt] through service or otherwise' opens a universe of means besides service for putting the defendant in possession of the complaint." *Ibid.* What are the dimensions of that "uni-

verse"? The Eleventh Circuit's opinion is uninformative. Nor can one tenably maintain that the words "or otherwise" provide a clue. *Cf. Potter v. McCauley,* 186 F.Supp. 146, 149 (D.Md.1960) ("It is not possible to state definitely in general terms the precise scope and effect of the word 'otherwise' in its context here because its proper application in particular situations will vary with state procedural requirements."); *Apache Nitrogen Products, Inc. v. Harbor Ins. Co.,* 145 F.R.D. 674, 679 (D.Ariz.1993) ("[I]f in fact the words 'service or otherwise' had a plain meaning, the cases would not be so hopelessly split over their proper interpretation.").

The interpretation of § 1446(b) adopted here adheres to tradition, makes sense of the phrase "or otherwise," and assures defendants adequate time to decide whether to remove an action to federal court. As the court in *Potter* observed, the various state provisions for service of the summons and the filing or service of the complaint fit into one or another of four main categories. *See* 186 F.Supp. at 149. In each of the four categories, the defendant's period for removal will be no less than 30 days from service, and in some categories, it will be more than 30 days from service, depending on when the complaint is received.

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 353–54, 119 S.Ct. 1322, 1328, 143 L.Ed.2d 448 (1999). The basis for this holding was summarized as follows:

Furthermore, the so-called "receipt rule"—starting the time to remove on receipt of a copy of the complaint, however informally, despite the absence of any formal service—could, as the District Court recognized, operate with notable unfairness to individuals and entities in foreign nations. *See* App. A–24. Because facsimile machines transmit instantaneously, but formal service abroad may take much longer than 30 days, plaintiffs "would be able to dodge the requirements of international treaties and trap foreign opponents into keeping their suits in state courts." *Ibid.*

*Id.* at 356, 119 S.Ct. at 1329 (footnote omitted).

Consequently, plaintiffs' claim that removal was untimely has been clearly rejected by the Supreme Court. Therefore, this claim is without merit.

### Federal Officer Defense

Plaintiffs have alleged that CBS, the successor corporation to Westinghouse, is liable for plaintiff Charles Corley's exposure to asbestos used in the manufacture of Navy turbines used on board ships upon which Corley was deployed and worked during certain times in his 17 years in the U.S. Navy.

Westinghouse asserts that it has established federal jurisdiction under 28 U.S.C. § 1442(a)(1), the "federal officer" removal statute. Plaintiffs object to this. In their Complaint, plaintiffs state, *inter alia:*

10. The Defendants' asbestos-containing products to which Charles Corley was exposed were in a defective condition and were unreasonably dangerous to the user, consumer or bystander for the following reasons:

a. The defendants' asbestos-containing products released respirable asbestos fibers when used in a manner that was intended and/or reasonably foreseeable by the defendants.

b. These defendants knew or should have known that the respirable asbestos fibers were hazardous to the health of users, consumers, or bystanders in that when inhaled these fibers caused a variety of diseases, including, but not limited to asbestosis and mesothelioma.

11. The asbestos machinery, products or equipment were in a defective condition and were unreasonably dangerous to the plaintiff, who was an intended and foreseeable user or bystander during the use of the asbestos. These defects include, without limitation, the following:

\* \* \*

b. Lack of warning or lack of sufficient warnings by the defendants, who were in a position of superior knowledge concerning the dangerous properties of asbestos when used for the purpose for which it was manufactured and sold, and which dangerous propensities were unknown to the plaintiff;

c. Lack of instructions or lack of sufficient instructions by the defendants for eliminating or minimizing the health risks inherent in the use of asbestos;

\* \* \*

g. Defective design by the defendants calling for the inclusion of asbestos in products that did not require asbestos, and where alternate, equally suitable substances were available;

h. Lack of warnings or lack of sufficient warnings by the defendants upon their discovering the full extent of the dangers presented by asbestos-containing materials and products;

\* \* \*

Plaintiffs assert that, when taken in conjunction with their disclaimer of any claim arising under the U.S. Constitution, including any claim against a federal officer or person acting under color of such office, Paragraph 11(g) does not make out a design defect claim against Westinghouse. They assert that they are only pursuing Westinghouse under its liability for failure to warn.

Westinghouse/CBS asserts that, assuming without conceding, that the only claim against Westinghouse is a failure to warn claim, the federal officer defense remains. In support of this claim, Westinghouse/CBS has presented the affidavit of James M. Gate, former manager of Design Verification of the Marine Division of Westinghouse Electric Corporation. (Doc. # 28–2, Aff. of James M. Gate). In his affidavit, Gates states that he is personally familiar with the extent of the U.S. Navy's control over the production of turbines built by Westinghouse for the U.S. Navy because he participated in the design, manufacture, testing, and sea trials of these turbines, and personally interacted with the Navy's machinery inspectors and other personnel at the Navy command in charge of obtaining and deploying these engines, known as the Naval Seas Systems Command or "NAVSEA." (*Id.* at ¶ 4).

According to Gate, all aspects of the design, performance requirements, and materials, including thermal insulation, used for construction of the turbines supplied by Westinghouse for use on board the USS Cavalier, were specified by NAVSEA. Gate states that compliance with the specifications could not be changed without direct approval of the appropriate Navy personnel. (*Id.* at ¶ 8). In addition, in the case of the USS Cavalier, NAVSEA specifications required the use of asbestos-containing thermal insulation for the turbines. The Navy, not Westinghouse, provided the insulation to be used with these turbines. (*Id.* at ¶ 9).

Gate further states that the Navy had precise specifications as to the nature of any communication affixed to machinery supplied by Westinghouse. According to Gate, Westinghouse would not have been permitted, under the specifications, associated regulations and procedures, to affix any type of warning or caution statement

to equipment intended for installation onto a Navy vessel beyond those required by the Navy without prior discussion with and approval by the Navy. (*Id.* at ¶ 31). The same was true with respect to the preparation of written materials delivered with the turbines, such as instruction books or technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. The manuals contained safety information to the extent, and only to the extent, directed by the Navy. (*Id.* at 32).

▮ A state-court action against any person acting under the direction of an officer of the United States or its agencies can be removed to federal court pursuant to § 1442(a)(1). The purpose of § 1442(a)(1) is to permit the removal of "those actions commenced in state court that expose a federal official to potential civil liability or criminal penalty for an act performed ... under color of office." *See Magnin v. Teledyne Cont'l Motors,* 91 F.3d 1424, 1427 (11th Cir.1996)(internal citations omitted). The statute reflects Congress' intent "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties." *See id.* As such, § 1442(a)(1) is an exception to the well-pleaded complaint rule, which generally precludes removal where a federal question is not apparent within the four corners of the complaint. *See Mesa v. California,* 489 U.S. 121, 136–37, 109 S.Ct. 959, 968–69, 103 L.Ed.2d 99 (1989).

▮ Removal under § 1442(a)(1) generally depends on the satisfaction of two separate requirements. First, the defendant must "advance a 'colorable defense arising out of [his] duty to enforce federal law.'" *See Magnin,* 91 F.3d at 1427 (internal citations omitted). Second, the defendant must establish that the suit is for acts performed "under the color of office." This requirement is satisfied by showing

" 'a causal connection' between what the officer has done under asserted official authority and the action against the defendants." *See id. See also Jefferson County v. Acker,* 527 U.S. 423, 431, 119 S.Ct. 2069, 2075, 144 L.Ed.2d 408 (1999) (internal citations omitted).

A colorable defense is a defense that is "plausible." *See Magnin,* 91 F.3d at 1427 (citing *Mesa,* 489 U.S. at 129, 109 S.Ct. at 964–65). In construing the colorable federal defense requirement, the Supreme Court has rejected "a narrow grudging interpretation" of the term, "recognizing that 'one of the most important reasons for removal is to have the validity' of the defense of official immunity tried in a federal court." *See Jefferson County,* 527 U.S. at 431, 119 S.Ct. at 2075 (internal citations omitted). *See also Willingham v. Morgan,* 395 U.S. 402, 407, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969) (We ... do not require the officer virtually to "win his case before he can have it removed."). Thus, a defense may be colorable even if the court ultimately rejects it. Indeed, no determination of fact is required at the removal stage. All a removing defendant needs to do is to make a showing that his federal defense "is not without foundation and made in good faith." *See Marley v. Elliot Turbomachinery Co.,* 545 F.Supp.2d 1266, 1271 (S.D.Fla.2008).

### I. "Colorable" Defense

▮ CBS (Westinghouse) has raised a federal contractor defense to the plaintiffs' design defect and failure to warn claims. In *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court addressed the issue of "when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect." *Id.* at 502, 108 S.Ct. at 2513. The court

recognized two necessary conditions for the displacement of state law. The predicate for preemption is that the case must concern an area of uniquely federal interest, such as procurement of equipment by the United States. After this inquiry has been satisfactorily addressed, displacement will occur only where "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* at 507, 108 S.Ct. at 2516 (citations omitted). The Supreme Court found that the facts in *Boyle* presented a case involving an area of uniquely federal interest in which a significant conflict existed between federal policy and state law.

Lieutenant Boyle, a United States Marine helicopter pilot, was killed when his helicopter crashed off the coast of Virginia during a training exercise. Although he survived the impact of the crash, Lieutenant Boyle drowned. He was unable to exit through the escape hatch because water pressure prevented it from being opened. The helicopter had been designed by a private contractor pursuant to government contract specifications. The government contract specified an escape hatch that swung outward. The complaint alleged that the escape hatch was defectively designed and should have opened inward.

After deciding procurement of military equipment is an area of uniquely federal interest, the court concluded that the state-imposed duty of care that was the asserted basis of the contractor's liability was "precisely contrary" to the duty imposed by the government contract. *Boyle,* 487 U.S. at 509, 108 S.Ct. at 2517. The court cautioned, however, that even in clear situations in conflict, a "significant interest" of federal policy must also exist to justify replacement of state law. *Id.* The court concluded that liability for de-sign defects in military equipment cannot be imposed, pursuant to state law, when

1. the United States approved reasonably precise specifications;

2. the equipment conformed to those specifications; and

3. the supplier warned the United States about the dangers in the use of equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518.

The Eleventh Circuit extended the holding of *Boyle* to failure to warn claims in *Dorse v. Eagle–Picher Indus., Inc.,* 898 F.2d 1487, 1489 (11th Cir.1990). Like this case, *Dorse* involved a claim that a manufacturer had failed to warn about the hazards of asbestos. The court noted that the federal contractor defense bars liability when (1) the case concerns an area of uniquely federal interest and (2) there is "a significant conflict" between an identifiable federal policy or requirement and a state law duty. The defense fails as a matter of law, however, if the contractor can "comply with both its contractual obligations and the state-prescribed duty of care." *See id.* at 1489 (internal citation omitted). The parties do not dispute that the procurement of Navy vessels (and parts for those vessels) is an area of uniquely federal interest. *See Boyle,* 487 U.S. at 504–05, 108 S.Ct. at 2514–15 (civil liability arising from performance of procurement contracts with government is an area of "uniquely federal interest"); *Dorse,* 898 F.2d at 1489 ("procurement of asbestos in World War II for naval ships is undeniably an area of uniquely federal interest"). The dispute in this case is whether defendants have shown a "good faith foundation" to argue that there was a conflict between their contractual obligations with the Navy and the state law duty to warn.

To satisfy their burden, defendants have filed the affidavit of James Gate referenced above in which he states that the Navy controlled every aspect of the building of the Westinghouse turbines, from the design specifications down to the warnings and instruction manuals. No deviation was allowed without specific approval of the Navy.

Gate has direct knowledge of the matters stated in his affidavit by virtue of his employment and the work he performed in relation to the acquisition and installation of the Westinghouse turbines on the USS Cavalier. The affidavit raises the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning. The affidavit states that the Navy exercised complete control over all warnings placed on equipment or in accompanying technical manuals by its contractors. By virtue of the position he occupied at Westinghouse during the relevant time period, Gate is competent to make the statements contained in his affidavit. In sum, Gate's affidavit establishes, for the purposes of this motion, that the Navy controlled the nature of warnings to be included on all equipment (or in the accompanying technical manuals) to be installed on its ships. This evidence in turn supports the inference that no warnings appeared on the turbines or in the written materials because the Navy prohibited them.

Plaintiffs argue that defendants have not shown that they tried to have the Navy approve warnings on the turbines regarding exposure to asbestos that the Navy rejected. Likewise, they contend that there is no evidence that an attempt was made by Westinghouse to have warnings placed in the instruction manuals or technical manuals supplied to the Navy personnel working on and around these turbines. However, in order to satisfy the first prong of § 1442(a), Westinghouse must demonstrate merely that its claim to the military contractor defense is "colorable." *Marley v. Elliot Turbomachinery Co.*, 545 F.Supp.2d 1266, 1273 (S.D.Fla.2008) (*citing Nesbiet v. General Electric Co.*, 399 F.Supp.2d 205, 212 (S.D.N.Y.2005)).

Although these arguments may undermine the credibility of Mr. Gate and raise a number of questions that the defendants will have to answer to ultimately prevail on their defense, it is unnecessary—and, at this stage, inappropriate—to determine credibility or likelihood of success. Unlike *Dorse*, which involved a motion for summary judgment, this matter concerns a motion to remand. Factual disputes about Mr. Gate's testimony should be resolved in federal court because defendants have a good faith foundation for their contractor defense. *See Magnin*, 91 F.3d at 1427–28; *Marley*, 545 F.Supp.2d at 1273. Therefore, CBS/Westinghouse has established a colorable defense to the extent required by § 1441(a)(1)

## II. Causal Nexus and "Acting Under" Requirements

It is undisputed that defendants designed the turbines for the USS Cavalier under the direct supervision and control of the U.S. Navy according to specifications from which Westinghouse could not deviate without advance approval from the Navy. The Navy controlled all aspects of the design and testing of these turbines, including any specific warnings to be placed on the turbines or in the written material supplied with the turbines. Therefore, there is no question that defendants' relationship with plaintiff derived solely from defendants' official duties.

Plaintiffs suggest that defendants need to show that the Navy actually prohibited asbestos warnings to establish a "causal nexus" at the removal stage. The court

disagrees. "Just as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute ... so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County*, 527 U.S. at 432, 119 S.Ct. at 2075. All a defendant needs to do to show a causal nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under their contract with the Navy. *See Magnin*, 91 F.3d at 1427–28. Defendants have done this. Defendants having provided a causal connection sufficient to meet the requirements of § 1442(a)(1), the Motion to Remand is due to be denied.

### III. Disclaimer

■ Plaintiffs make the argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand. In their complaint, plaintiffs expressly disclaim every claim arising under the Constitution, treaties or laws of the United States, including any claim arising from an act or omission on a federal enclave, or by any officer of the United States or any agency or person acting under him/her under color of such office. However, as noted above, there is still a colorable "federal officer" defense to the failure to warn claim which plaintiffs have expressly stated that they are pursuing against Westinghouse/CBS. It is also questionable as to whether this disclaimer is valid as to plaintiffs' design defects claims against Westinghouse/CBS.

The court finds the treatment of this issue by the U.S. District Court in *Marley* to be most sensible wherein it stated:

> Finally, I reject the plaintiffs' argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand.

In their complaint, the plaintiffs allege that:

> Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or any federal office of the U.S. or agency or person acting under him occurring under color of such office.)

Compl. at ¶ 5.

This disclaimer is circular. Its applicability depends on a determination of the core question in this case: whether the defendants' purported omission—the failure to warn—was required or caused by their contractual relationship with the Navy. If the failure to warn was required by the Navy, the disclaimer applies and the plaintiffs' claims fail as a matter of law. If the failure to warn was not required by the Navy, then the disclaimer does not apply. The problem with this argument is that the defendants have the right to have this question decided in federal court. *See Jefferson*, 527 U.S. at 432, 119 S.Ct. 2069, 144 L.Ed.2d 408 (defendants have a right to have " "the validity" of the defense of official immunity tried in a federal court").

I understand that a number of courts have found that federal liability disclaimers defeat removal under § 1442(a)(1). *See e.g., Westbrook v. Asbestos Defendants*, 2001 WL 902642, *3 (N.D.Cal. July 31, 2001).

The disclaimers in those cases, however, waived any liability arising out of work done on federal premises, irrespective of whether the work was done under the requirements of a federal agency or not. In contrast, the disclaimer here is more limited and is contingent on the Navy's

**1336**

contractual limitations and specifications. I am reluctant to find that the plaintiffs can defeat a government contractor's right to remove by disclaiming any claim arising from any act or omission compelled by a government agency. Such a circular disclaimer would defeat the purpose § 1442(a)(1) as it would force federal contractors to prove in state court that they were acting under the direction of the government.

*Marley,* 545 F.Supp.2d at 1274–75.

In addition, the court notes that several other courts to consider the issue have found similar such disclaimers ineffective. *See, e.g., O'Connell v. Foster Wheeler Energy Corp.,* 544 F.Supp.2d 51, 54 n. 6 (D.Mass.2008); *Machnik v. Buffalo Pumps, Inc.,* 506 F.Supp.2d 99, 103 n. 1 (D.Conn.2007).

CONCLUSIONS

Based on the foregoing analysis, the undersigned magistrate judge believes that defendants have sufficiently established that some of the events alleged in the Complaint with regard to Owens–Illinois and Garlock occurred on a federal enclave. It further appears that defendants have made a colorable showing of a "federal officer" defense. Therefore, it is ORDERED that plaintiffs' Motion to Remand hereby is DENIED.